**In re BECK INDUSTRIES, INC., Debtor.**

**Howard ROSS and Butler's Shoe Corporation, Defendants-Appellants,**

v.

**Stephen KIRSCHENBAUM, as Trustee in Reorganization of Beck Industries, Inc., and Edison Brothers Stores, Inc., Plaintiffs-Appellees.**

Nos. 1102, 1190, Dockets 79–5016, 79–5021.

United States Court of Appeals, Second Circuit.

Argued May 9, 1979.

Decided June 26, 1979.

Arthur S. Olick, New York City (Anderson, Russell, Kill & Olick, P. C., New York City, Tina L. Wellner, New York City, of counsel), for defendant-appellant Butler's Shoe Corp.

Michael L. Cook, New York City (Weil, Gotshal & Manges, New York City, of counsel), for defendant-appellant Howard Ross.

Lonn Trost, New York City (Shea, Gould, Climenko & Casey, New York City), for plaintiff-appellee Reorganization Trustee.

Henry Kohn, New York City (Frankenthaler, Kohn & Schneider, New York City), and Otterbourg, Steindler, Houston & Rosen, P. C., New York City (Jonathan N. Helfat, New York City, of counsel), for plaintiff-appellee Edison Bros. Stores, Inc.

Before FRIENDLY, SMITH and OAKES, Circuit Judges.

FRIENDLY, Circuit Judge:

This appeal and cross-appeal raise questions with respect to the judicial sale of certain assets of Beck Industries, Inc. (Beck), a debtor which has been in reorganization under Chapter X of the Bankruptcy Act in the District Court for the Southern District of New York since May, 1971. The proceedings were initially under the supervision of Bankruptcy Judge Herzog; upon his retirement they were referred to Bankruptcy Judge Ryan. There have been sev-

eral changes in the trustees, the latest of whom is Stephen Kirschenbaum.

### I.

Since neither the opinion of the bankruptcy judge, rendered after a 6 day trial, nor that of the district court gives a full statement of the facts which are crucial to decision, we are obliged to do this at some length.

When the reorganization petition was filed, Beck, a conglomerate, was engaged, among other things, in the retail sales of women's shoes and, to a lesser extent, of women's ready-to-wear through its C. H. Baker Division (Baker) which operated on the west coast. The ready-to-wear departments, which were added to some of the Baker stores in 1970, were run as boutiques; in 1971, Baker, developing the boutique concept, took one lease for a "Pigeons" unit which opened under the administration of the trustees. In October 1971, with the approval of the bankruptcy judge, Beck formed Pigeons, Inc. (Pigeons) to undertake the boutique operations previously conducted by Baker. One reason for this was that landlords preferred leasing to a solvent corporation rather than to a reorganization trustee. The Pigeons stores, or "boutiques", also sold both women's shoes and women's ready-to-wear, although the emphasis was on the latter. Pigeons has also become the nominal lessee of almost all of the stores operated as Baker stores. Baker has continued to operate, selling both shoes and ready-to-wear; its assets consist primarily of trade fixtures and inventories; separate accounting records for Baker and Pigeons are maintained.

Howard Ross was hired by Beck in 1969 to head up the Baker division. He became the head of Pigeons when that company was formed. On February 4, 1973, Ross entered into an employment agreement with the then trustees, which was subsequently approved, on notice to interested parties and after a hearing, by Judge Cannella upon the recommendation of Bankruptcy Judge Herzog. Ross agreed that during the three year term of the contract he would serve as president and chief executive officer of Baker and as president, chief executive officer and a director of Pigeons, at a monthly salary of $5,125, which was to be split between Baker and Pigeons in accordance with their respective gross sales for the previous fiscal year. He was also to receive a bonus of 5% of the net pretax income of Baker and, subject to Pigeons' attaining stipulated income levels, amounts of Pigeons stock which ultimately resulted in his becoming the owner of 15% of its shares. Paragraph 9, whence this litigation stems, provided as follows:

If during the period the Employee is employed by Employer, Employer receives an acceptable offer to sell all or substantially all of the assets or more than 50% of the outstanding stock of Pigeons, Employers shall give written notice of such offer to the Employee and said notice shall set forth all of the terms and conditions of the proposed sale. The Employee shall have the right, which must be exercised within 30 days of receipt of said notice, to become the purchaser of said assets or stock, as the case may be, on the same terms and conditions as set forth in said notice; provided, however, that the Employee shall not be afforded such right if, in the Employer's opinion, a substantial portion of the purchase price is not paid in cash at the initial closing, and if, in the Employer's opinion, the Employee's ability to pay the remaining portion of the purchase price is not at least as good as that of the proposed purchaser. In addition, if Employee does not exercise his rights under the preceding sentence or is not entitled to such rights by virtue of the proviso to such sentence, should Employer receive an offer to buy more than 50% of the outstanding stock of Pigeons while Employee is employed by Employer and if Employer accepts such offer, Employer will use its best efforts to have the offeree purchase all of the Pigeons stock owned by Employee on the same terms as Employer is selling; provided, however, that such best efforts requirement shall not be construed to require Employer to

modify any terms of its agreement with the purchaser.

Paragraph 13 provided in pertinent part:

13. This Agreement shall not be assignable by the Employee and any purported assignment shall be void . . .

On March 15, 1976, Ross wrote the trustee about his contract having ended. He characterized its terms as having been essentially these:

(a) Annual salary, $61,500 per year, (b) 5% of profit before taxes of C. H. Baker Division before corporate allocation paid yearly as a bonus, and (c) the right to earn 15% of the stock of Pigeons, Inc., together with an agreement not to sell the rest of the Pigeons' stock without offering it to me first.

He proposed "the following: 1) Salary be increased to $67,500 and 2) 5% of Baker profits as previously defined continue." The letter concluded:

I don't want to go through the hassle of negotiating a new contract. I would simply like you to approve the raise and continue the bonus if you consider this to be fair and equitable. I'm not asking for the right to earn any more Pigeons stock since this would require drawing up a new contract. I hope I will be able to purchase the business before the end of the year and the Pigeons stock will, in my opinion, become a negotiating point anyway.

On April 26, 1976, the trustee wrote his counsel, characterizing Ross' proposal as "not negotiating a new contract, but leaving all the terms and conditions the same, except for a raise in base salary from $61,-500 to $67,000,"[1] which he found acceptable. He assumed the matter would be covered by a letter agreement and asked counsel to follow through. This was not done. The trustee testified before the bankruptcy judge that he, his counsel, and Ross thought it "unseemly" to sign a "term contract" while Ross was negotiating to purchase the "company". By letter of October 8, 1976 wherein Ross urged the trustee to merge

Baker into Pigeons, he suggested that "the only fair way to approach this would be for me to enter into an agreement with you to give up my equity [in Pigeons] prior to the merging of Baker and Pigeons" and confirmed that he has "a right of first refusal for the purchase of the Pigeons Corporation" which he "would not be willing to relinquish." Ross again alluded to his right of first refusal in a letter dated October 12, 1976 to the trustee.

On February 9, 1978, following many months of discussion, Beck (represented by the trustee), Ross and a newly formed California corporation, H & R Rossco, Inc. (Rossco), entered into a Stock Purchase Agreement whereby Rossco would buy all the stock of a new Beck subsidiary, Newco, which would own the 85% of the Pigeons stock held by Beck and the assets of Baker. For present purposes it suffices to describe the price as $800,000 of which $500,000 was to be paid in cash and $300,000 in five year 6% promissory note. The sale was subject to:

Approval by the Court of the transactions contemplated by this Agreement, which approval is subject, among other things, to the Court's approval of any higher and/or better offer or offers for the acquisition of the Stock, the assets of Newco, the Pigeons' stock, the Assets or a substantial portion thereof.

On application by the trustee, the bankruptcy judge thereupon issued an order requiring all interested parties to show cause on April 19, 1978, why an order should not be entered allowing the trustee to make the sale contemplated by the Stock Purchase Agreement or to accept:

a higher and/or better offer or offers for (a) 85% of the capital stock of Pigeons or (b) the assets of Baker or (c) collectively, 85% of the capital stock of Pigeons and the assets of Baker, on such terms and conditions as may ultimately be determined herein . . ..

A corresponding notice was published. Nothing in the Stock Purchase Agreement, the order to show cause, the trustee's appli-

1. This should have been $67,500.

cation for it, or the notice referred to Ross' right of first refusal.[2]

On April 14, 1978, appellee and cross-appellant Edison Brothers Stores, Inc. (Edison), a large retail chain store operation,[3] submitted a written offer to the trustee, which was reiterated at the April 19 hearing, to purchase all of the Pigeons stock or assets and the Baker assets for $1,150,000 in cash, subject to several conditions principally pertaining to encumbrances and assignability of leases, and requested information in regard to the leases and business operations. Another party, Judys, Inc., expressed interest in making an offer. The bankruptcy judge adjourned the hearing until May 11 so as to permit Edison to examine the leases, interested parties to analyze the offers, and any other bidders to appear.

On April 24, Ross sent a letter to the trustee. It began with a statement that "Edison Brothers and certain other outside parties have recently shown an interest in possibly acquiring the stock of Pigeons, Inc.", confirmed a reminder to the trustee of Ross' claim to a right of first refusal on the stock and requested that the trustee immediately notify "Edison Brothers and any other party interested in bidding on the Pigeons stock of my right of first refusal". Nothing was said of any such right with respect to the Baker assets.

Three days later, on April 27, 1978, Atlanta counsel for appellant Butler's Shoe Corporation (Butler)[4] wrote the trustee. The letter stated that counsel had been unsuccessfully attempting to reach the trustee to communicate Butler's interest in the proposed sale.[5] Leasehold and other business information was requested and was furnished. On May 3 Edison offered the trustee a choice among three plans. First, Edison would pay $1,015,000 for 85% of the Pigeons stock and the Baker assets; it would pay an additional $135,000 for Ross' stock in Pigeons if he wished to sell. Second, Edison would pay the trustee $1,150,000 for the package. Third, it would purchase the trustee's interest alone for $1,015,000 and eventually force Ross out through the dissolution of Pigeons. The letter took note of Ross' claimed right of first refusal, observed that the trustee's application for approval of Ross' offer did not include its terms, and reserved the right to make a higher and better offer if the trustee received an offer from Ross or any other source as good as or better than Edison's.

As found by the bankruptcy judge:

Between April 19, 1978, and May 4, 1978, Ross and the trustee were in constant communication. The trustee informed Ross of the various interested parties and urged him to make a deal with Edison Bros., because he feared Ross

---

2. Ross testified before the bankruptcy judge that he had urged the trustee to refer to the right of first refusal in the Stock Purchase Agreement and in the court application. In a letter dated August 2, 1977 to his counsel, with a carbon copy to the trustee, Ross did suggest that the application should recognize his right of first refusal in order to "discourage any interference". The trustee testified that no mention was made of any right of first refusal, either because the Stock Purchase Agreement pertained to a purchase by Ross of the entire package or because it "might have been forgotten."

3. Edison is a retailer of apparel and hardware with headquarters in St. Louis, Missouri. As of the end of 1977, its common stock equity exceeded $160,000,000 and its common shares had been listed on the New York Stock Exchange since June 1939.

4. Butler, a division of Zale Corporation, is based in Atlanta and sells shoes throughout the United States. Joseph Shapiro, Butler's President and Chief Executive Officer, deposed that Edison is one of Butler's "biggest competitors", and that Butler has stores in California and Arizona, where many Baker-Pigeons stores are also located.

5. Ross testified that Shapiro called him on April 17 to express interest in acquiring the shoe business of Baker-Pigeons if Rose had "trouble bidding with Edison". Shapiro, according to Ross, "had no intention of bidding on his own or getting into this situation on his own, but he did say . . . if Edison did he probably would". Ross was not certain whether he informed the trustee of Shapiro's interest but thought that he "probably did not" because he "didn't consider it important at the time".

would be "swallowed up" if it came to a bidding war. From May 4, 1978 through May 11, 1978, communications between Ross and Kirschenbaum broke down.

Ross testified that on May 3, counsel for the trustee informed him that Edison's recent offer was " 'a real one' " in which "[t]hey were definitely interested", and that Butler was sending some lawyers to New York on May 4 and 5 to examine the leases. On May 4, the trustee also told Ross of Butler's interest and warned him to take a ·job with Edison. Ross replied that he knew of Butler's interest and that he "had every intention of setting up a meeting for tomorrow morning with Butler people" in order to "make a deal for myself". Ross then called Atlanta to set up an appointment with Shapiro who happened to be on his way to Los Angeles to look at Baker-Pigeons stores. At a breakfast meeting the next day, Shapiro reiterated to Ross that Butler wanted only the shoe business. Ross responded that such a division would be difficult and that he doubted whether he could finance the purchase of the ready-to-wear business since it did not exist as a separate business entity. Ross proposed that Butler provide financial assistance but Shapiro remained non-committal, suggesting a second meeting in Atlanta which took place on May 7. At that meeting Ross, this time accompanied by his attorney, Arthur Levine, resumed the discussion with Shapiro and George Heald, another Butler employee. On the next morning, Ross and Levine met with Shapiro and Heald in the offices of Jonathan Golden and Jack Wayne Crosby, Butler's counsel. Ross, who was on his way to New York to consult with a bankruptcy lawyer, Michael Cook, over enforcing his right of first refusal, happened to have a copy of his employment contract, and informed Shapiro at the beginning of the meeting that he believed he had a right of first refusal on Pigeons stock. Ross claims that Butler's counsel questioned

whether a court would uphold the right and the meeting moved on to other subjects. They spent a great deal of time discussing how the business was to be divided, but also discussed the mechanics of the bidding and. financing Ross' participation. While these meetings were in progress, the trustee telephoned Butler's counsel in Atlanta to find out what had happened to Butler's interest, but was put off. The discussions culminated in a Joint Venture Agreement (JVA) dated May 8, 1978.

The purpose of the JVA was to acquire all the stock or assets of Pigeons and the assets of Baker. The agreement recited that "Ross believes he has a right of first refusal to purchase from· Beck 85% of the Pigeon's stock . . . ." Ross agreed to appear at the May 11 hearing and any subsequent ones and to bid up to $1,800,000 for the 85% of Pigeons and the Baker assets owned by Beck. Butler was to pay the price. The assets of Pigeons and Baker would then be divided, with assets devoted to the shoe operations going to Butler and the assets relating to ready-to-wear operations going to Ross. Subject to an upward adjustment if any leases could not be assigned to Butler, Ross was to pay Butler 30% of the "Adjusted Beck Price" less a credit of the greater of $135,000 [6] or 10% of the Adjusted Beck Price. If the purchase price was $1,215,000 or less, the Adjusted Beck Price was to be the purchase price plus $135,000; if the purchase price was more than $1,215,000, the Adjusted Beck Price was to be ¹⁰⁄₉th of the purchase price.[7] This price was to be payable $75,000 in cash and the balance in a note, except that the note should not exceed $325,000 and any excess would have to be paid in cash. If the bidding should exceed $1,800,000, Ross was to consult with Butler. If Butler authorized a higher bid, Ross could either elect to participate as a joint venturer on the same terms or bid as the agent of Butler and retain his 15% stock interest in

---

**6.** It will be noted that this was the same sum Edison had offered the trustee to pay for Ross' 15% stock interest in Pigeons.

**7.** The effect of this was that if the purchase price was $1,215,000, Ross would pay $270,000 for the ready-to-wear business but that if he was forced to bid $1,800,000, the price to him would increase to $400,000.

Pigeons in which event Ross would enter into an employment agreement with Butler to operate the ready-to-wear business and "the assets and liabilities of Pigeon which relate to C. H. Baker shall be transferred to Butler."

On May 9 counsel for the trustee gave Ross formal notice of Edison's offer of May 3. Ross had come to New York where on May 9, he consulted his New York attorney, Simeon Brinberg, about the JVA. They concluded that the trustee should not be informed about it, at least for the moment. Later in the day, Ross, Brinberg, Brinberg's associate, and Arthur Levine met with Michael Cook. They agreed that the trustee should not be informed of the JVA. On May 9 or 10 Ross had a telephone conversation with counsel for the trustee, inquiring whether the latter thought he should make a deal with Edison; Ross said nothing about the deal he had already made with Butler.

On May 10, there was another meeting at Cook's office. Ross; Levine, his California counsel; Golden and Crosby, Atlanta counsel for Butler; Cook and some associates were present. It was again concluded that the trustee should not be told of the JVA. At the end of the meeting Golden telephoned the trustee's counsel, Lonn Trost, who had been trying to contact him in order to ascertain what had happened to Butler's interest in bidding. Although there is some minor conflict as to just what was said, the net is that Golden told Trost that Butler was "helping" Ross in some way and would not itself bid but there was no disclosure of the JVA. Also on May 10 Ross submitted a proposed order requiring the trustee to show cause why further bidding should not be stayed so that he could match the Edison offer and threatened to hold the estate liable if the trustee denied his rights. Ross' affidavit, notarized by Cook, did not disclose the existence of the JVA.[8] The bankruptcy judge made the order to show cause returnable at the same time as the ad-journed hearing on the sale to Ross that had previously been directed for the following day.

On the morning of May 11, prior to the hearing, counsel for Edison submitted to the trustee a substantially increased offer of $1,368,000. Again a variety of arrangements was proposed; if Ross wished to sell his 15% stock interest in Pigeons, Edison would pay him $182,000.

At the hearing on May 11, the bankruptcy judge began by endeavoring to elicit the trustee's position with respect to Ross' order to show cause. This led counsel to say "the trustee does recognize the existence of a right of first refusal with respect to Pigeons, not with respect to Baker." When the judge inquired whether the two properties were severable, counsel for the trustee thought this to be "questionable at this time" but the trustee said "with great difficulty they are severable." After the judge had expressed understandable displeasure about not having been earlier informed of the first refusal problem, see note 2 *supra*, counsel for the trustee expressed a desire "to see whether or not there is anyone in the court today other than Edison and Mr. Ross who would like to bid on this." Counsel for Edison advised the judge of its new offer and argued that Ross had no right of first refusal because the three-year employment agreement had expired. There was a colloquy between the judge and counsel for bank creditors who took the view that the right of first refusal continued, that it entitled Ross to match the highest rather than the first bid, and that the most feasible course was to sell the Pigeons-Baker package. The judge inquired whether there was a severable bid for Pigeons and received no answer. He then asked whether the trustee thought the proceedings should be put over. The trustee thought the best course would be to give Edison an opportunity to increase its offer for the Pigeons-Baker "package" and then have Ross "match it or

---

8. The affidavit stated:

At the hearing on April 19, 1978, I informed counsel for the Trustee that I had a contractual right to purchase the Pigeons stock and Baker assets on the same terms as Edison, and that I had 30 days in which to do so. Nothing in the record of the hearing supports this.

back away from the company." Cook agreed. When the judge inquired whether other persons who had indicated interest at the April 19 hearing had "evaporated", the trustee answered:

No, they haven't, but it appears that some of those interested parties who might have been serious contenders, partially, to our knowledge, partially not to our knowledge, have aligned themselves with the two main issues of Edison and Mr. Ross.

Ross and Cook remained silent. The judge then asked whether Edison had made its final offer, counsel answered it was the "final offer at this time" because

if Mr. Ross matches this at any time that you see fit, with proper safeguards

that satisfy the court, we will still take the position that if he matches it, that is not the legal solution or the conclusion of this matter because he's not entitled.

The judge then asked whether the trustee was prepared to accept the Edison offer and said he would then rule on the right of first refusal.

After an adjournment[9] counsel for the trustee announced that, subject to a qualification not here material, the Edison offer was satisfactory but suggested that if the judge were to uphold Ross' right of first refusal, Edison might be given a further opportunity to bid higher. Extensive colloquy about the right of first refusal ended in the passages quoted in the margin[10] and ultimately in the judge's saying:

Mr. Cook: That's right.

Mr. Kirschenbaum: Exactly.

The Court: All right, fine. We have an offer of $1,368,000 for the package.

\* \* \* \* \* \*

The Court: You can't sell the package.

Mr. Kirschenbaum: Yes, your Honor. Therefore, what I had—

The Court: Without first being relieved of your contractual obligation of first refusal. It's that simple.

Mr. Kirschenbaum: If that obligation exists.

The Court: So, therefore, Edison has to be spinning wheels because if it goes up to $20 million, they don't have to match it because I can't deliver the package at $20 million because they have a right of first refusal on a part of it, correct?

Mr. Kirschenbaum: Yes.

The Court: That's what it looks like to me.

Mr. Kirschenbaum: Yes, your Honor. But in the event that does take place, both sides intend to fall by the wayside because you would look at a dismemberment, which gets very complicated.

The Court: As I understand it, Edison and Ross now wish to engage in competitive bidding for the package. Why don't we do that. The trustee is willing to take $1,368,000. Either of these people may offer more. So we have $1,368,000. Does anybody wish to offer more than $1,368,000 for the package?

Mr. Kirschenbaum: Your Honor—

The Court: Just a minute, Mr. Cook, does Mr. Ross wish to attempt to better the offer of $1,368,000?

Mr. Cook: Under our right of first refusal—

The Court: Please. Yes or no I think is appropriate here.

9. Ross, supported by the deposition testimony of Levine, claims that during the adjournment he told the trustee he had made some arrangement with Butler. This was denied by the trustee, his counsel, and a representative of his accountants, S. D. Leidesdorf & Co., who was present. Ross does not claim to have revealed the full facts. Whatever the truth on this may be, it is clear that nothing more about any association between Ross and Butler was told to the court.

10. The Court: However, Ross doesn't claim a right of first refusal on the package. He only has a right of first refusal on Pigeons, correct, Mr. Cook?

Mr. Cook: That's correct, your Honor.

The Court: So where are we?

Mr. Kirschenbaum: But in point of fact neither side wants to take the company dismembered.

The Court: All right.

Mr. Kirschenbaum: And since that is the truth of the matter, we need not get into the—

The Court: Do you object, Mr. Cook, to our having competitive bidding between Ross and Edison?

Mr. Cook: No, I don't, your Honor.

The Court: How can you request that there be no competitive bidding on the package when you only have a right of first refusal on a part of the package? I don't understand your theory on that.

Mr. Cook: Well, if we are going to go to competitive bidding, we are not waiving our right of first refusal on the Pigeons stock.

The Court: All right, we will have competitive bidding and no matter where you get, you have a right to put a stick between the legs of whoever is going to be in the race because you still have your right of first refusal.

The Court: The auction ended a few minutes ago. We had a bid of $1,368,000 and no bidder offered more. So that's the end of the auction. There is no auction anymore. So Edison is offering the trustee $1,368,000 for the package. But the trustee can't deliver the package. So that's the end of these proceedings.

After much more of the same the trustee, out of the blue, came up with the suggestion that the real intent all along had been to give Ross a right "of first refusal of the company he was running", to wit, both Pigeons and Baker. Grasping at this straw the judge said:

The Court: If he has a right of first refusal on the package, then today there is an offer of $1,368,000 and if the trustee is willing to take $1,368,000, we have closed the bidding, that's it and it's up to Ross; he has a right of first refusal.

When the trustee objected that Edison should be given further time to increase its bid, the judge declined to do so in light of the trustee's new position as to the scope of Ross' rights. When asked whether $1,368,000 was Edison's best offer, counsel answered as stated in the margin.[11] After much more discussion the court announced that if Ross was prepared to pay $1,368,000 he would "direct the trustee to enter into a contract with Ross and that's the end of it." Cook announced that Ross was so prepared; nothing was said to enlighten the trustee or the court that the true payor was Butler. The court directed:

that an appropriate order be settled which will find that at this auction the highest bid was $1,368,000 and that Ross under his right of first refusal opts at the present time to meet that.

Mr. Cook: Not on the stock.
The Court: So that the best offer we have is $1,368,000 for the package, Mr. Kirschenbaum. Now, is the trustee of the opinion that he can deliver the package without trampling upon the rights of Mr. Ross, who has a right of first refusal of a part of the package that the trustee wishes to sell?
Mr. Trost: No, we do not, your Honor.
The Court: So, therefore, we can't accept the offer of Edison.

11. My response is that we are prepared to stand at that figure now without alteration, with

Ross and his counsel and Butler's counsel lost no time in calling a representative of the trustee's accountants in Los Angeles to request their assistance in separating the business of Pigeons and Baker. According to the accountant, they asked that the inquiry be kept strictly confidential, even with respect to the trustee. The accountant, who quickly grasped the implications of Ross' arrangement with Butler, immediately advised the trustee. Ross called the trustee on the evening of May 11, apparently still not disclosing the JVA; the trustee confronted him with it and expressed concern that Ross had not disclosed it before or at the hearing. At about the same time, the trustee spoke to Cook in the same vein; Cook expressed embarrassment.

On May 16 the trustee, his counsel, and his accountant met with counsel for Ross and Butler, was furnished a copy of the JVA, and concluded he would not recommend confirmation of the sale. Two days later Cook addressed a letter to counsel for the trustee. He enclosed a copy of the JVA, made a quantity of self-serving statements, and requested that the sale to Ross be confirmed.

## II.

The trustee and Edison responded with complaints asking that the sale not be confirmed. Edison set forth a number of grounds: that Ross' right of first refusal had expired at the end of his three-year employment contract; that he had assigned it to the JVA and had thus rendered it void; that it extended only to the Pigeons stock but the court had been misled into convert-

the express understanding, caveat, reservation which I made earlier that if Mr. Ross were to come up with the $1,368,000 at the end of 30 days or whatever period of time you give him, we would then take the view that he is not entitled to carry through his proposal because he doesn't have a right of first refusal and we are ready at that point to continue to bid with him or anybody else if we can convince you that that is a correct position.

ing it into a right of first refusal on both the Pigeons stock and the Baker assets; that Ross had waived or should be estopped from claiming a right of first refusal on the Pigeons stock since he had led the trustee down the road of offering the Pigeons stock and the Baker assets for sale as a package; and that Ross, with Butler's assistance, had breached his fiduciary duties and perpetrated a fraud by entering into the JVA and also by failing to disclose it. The trustee alleged Ross and Butler had a duty to disclose their agreement, and that their non-disclosure had chilled the bidding. Edison also asked that a sale to it for $1,368,000 should be confirmed or, alternatively, that Ross and Butler should be disqualified from bidding at any new sale. After a trial the bankruptcy judge rejected all these contentions and on November 22, 1978 directed the trustee to close the sale to Ross within two weeks. The trustee and Edison applied for a stay, with Edison agreeing that if there was a new sale, it would start the bidding at $1,368,000 unless there had been a drastic change in conditions.[12] The bankruptcy judge denied this.

The trustee and Edison appealed to the district court and again sought a stay under the same conditions, which the court denied. On Edison's appeal from this denial, we directed the district court to grant a stay on condition:

> that Edison Brothers Stores, Inc., formally execute an agreement whereby its previous offer to the Trustee of $1,368,-000 for the 85% stock interest in Pigeons and for the assets of Baker be open and continuing pending final determination of said appeal and further conditioned upon Edison's posting of a supersedeas bond to compensate Ross and/or Butler Shoe Corp. for possible loss of profits in a sum to be fixed by the District Court not to exceed $50,000 in amount.

On appeal from the bankruptcy judge, Judge Cannella, in a decision dated March 23, 1979, reversed the judgment of the bankruptcy court confirming the sale. The primary basis for his decision was that the finding of the bankruptcy judge that Ross' right of first refusal extended to the Baker assets was clearly erroneous within Rule 810 of Bankruptcy Procedure, made applicable by Rule 10–801. He relied not only on the plain language of the employment agreement but on the fact, as to which also he was demonstrably correct, "that throughout the discussion, all the parties, including Ross, admitted that Ross' right of first refusal extended only to the 85% of Pigeons owned by Beck". He dismissed the trustee's concession to the contrary during the May 11 hearing, a position which the trustee disavowed, as born of a sense of frustration that Ross' insistence on a right of first refusal for the Pigeons stock alone had created an impasse wherein the bankruptcy court could not ·sell the "package" for which it had invited bids without disclo-- sure of the first refusal problem. Although the district judge believed that the trustee and the bankruptcy judge were not precluded from giving Ross a right of first refusal on the "package" in consideration of his relinquishing that right on the Pigeons stock alone, that was not the basis on which they acted and, even if they did, "the trustee should not be allowed to rescind that extension on the ground that Ross had materially misled him into granting it." He found such misleading to have occurred in Ross' having convinced the trustee and the bankruptcy judge that the Pigeons stock and the Baker assets could not profitably be sold separately, whereas the JVA was strong evidence to the contrary. If the trustee had known that Ross' real interest lay in the clothing operation, he might have

---

12. A stay was peculiarly necessary because of the provision in Bankruptcy Rule 805 and Chapter X Rule 10–801(2) that:

Unless an order approving a sale of property or issuance of a certificate of indebtedness is stayed pending appeal, the sale to a good faith purchaser or the issuance of a certificate to a good faith holder shall not be affect-

ed by the reversal or modification of such order on appeal, whether or not the purchaser or holder knows of the pendency of the appeal.

Although this rule would offer no protection to Ross and Butler, the possibility that they would disperse or encumber some of the assets was real.

been able to work out favorable terms for the sale of this to Ross and then have had an unimpeded auction for the shoe business. The court mentioned other courses based on separation of the assets which the trustee might have taken had he known the facts.

On the other hand the district court sustained the bankruptcy judge's conclusions that Ross' right of first refusal survived the three years of his employment agreement as not clearly erroneous or contrary to law, with which we agree, and "that Ross retained his rights despite his endeavors to purchase the Baker/Pigeons operation as a package and despite his agreement with Butler." The court saw no reason to disqualify Ross and Butler from further bidding.

Ross and Butler have appealed from so much of the district court's order as reversed the judgment confirming the sale to Ross. The trustee defends the order on the basis on which it was made and asserts other grounds supporting it as well. Edison has appealed from so much of the order as refused to direct confirmation of the sale to it or to disqualify Ross and Butler from further bidding, because of their allegedly inequitable conduct.[13] On Ross' and Butler's appeal we affirm; on Edison's appeal we decline to order that the sale be confirmed to it or to disqualify Ross and Butler from bidding but direct that they should be barred from acting in conjunction and that Ross should be precluded from interposing his right of first refusal on the Pigeons stock as a bar to sale of the package if the latter procedure will produce a larger price or is necessary to avoid substantial further delay.

### III.

The district court's decision seems to result, as a practical matter, in placing everyone back where they were at the hearing of May 11, 1978. On a resale of the package

Ross could again claim that since it includes the Pigeons stock and he has been given no opportunity to meet a separate bid on that, the sale cannot be made. Absent some consensual arrangement with Ross, the only escape would be a division or redistribution of the Pigeons and Baker assets. All agree this would be difficult; Ross says it would be impossible without his cooperation which, he indicates, would not be forthcoming. Certainly the process would be costly and time-consuming; very likely it would lead to still further litigation. Meanwhile, as Ross and Butler strongly argued in opposing a stay, values might disappear, along with key employees and potential landlords and creditors. In our view Ross has forfeited any right to impose such further burdens on this estate.

We need not belabor the point that a bankruptcy court sits as a court of equity, see *Local Loan Co. v. Hunt*, 292 U.S. 234, 240, 54 S.Ct. 695, 78 L.Ed. 1230 (1934); *Pepper v. Litton*, 308 U.S. 295, 304–305, 60 S.Ct. 238, 84 L.Ed. 281 (1939). In the latter case the Court declared that "rules governing the fiduciary responsibilities of directors and stockholders come into play on allowance of their claims in bankruptcy." 308 U.S. at 307, 60 S.Ct. at 246. This principle is not limited to "claims" in the ordinary sense or to the precise types of fiduciaries named in the Court's opinion; it pervades bankruptcy administration. However, as Mr. Justice Frankfurter observed in *SEC v. Chenery Corp.*, 318 U.S. 80, 85–86, 63 S.Ct. 454, 458, 87 L.Ed. 626 (1943):

> But to say that a man is a fiduciary only begins analysis; it gives direction to further inquiry. To whom is he a fiduciary? What obligations does he owe as a fiduciary? In what respect has he failed to discharge these obligations? And what are the consequences of his deviation from duty?

---

**13.** Although it has been held that an unsuccessful bidder lacks standing to challenge a confirmation of a sale on grounds relating to the terms of the sale, *In re Realty Foundation Inc.*, 75 F.2d 286 (2 Cir. 1935), Edison, whose bid was matched but not exceeded, is attacking the sale "on equitable grounds related to the intrinsic structure of the sale", thus bringing itself "within the zone of interests which the Bankruptcy Act seeks to protect and to regulate." *In re Harwald Co.*, 497 F.2d 443, 444–45 (7 Cir. 1974).

Ross' status was hybrid. As a highly positioned employee of Beck since 1969 and later of the trustees or trustee, he had some "fiduciary" obligations. Clearly, for example, he was not at liberty to disclose to outsiders confidential information concerning the operations under his supervision. On the other hand, the first refusal provision of the employment agreement created a built-in conflict of interest, but one which cannot be held against him since it was approved by the bankruptcy court on notice to all interested parties. See *Mosser v. Darrow*, 341 U.S. 267, 274, 71 S.Ct. 680, 95 L.Ed. 927 (1951). He was not obliged, as the trustee was, to take affirmative action to obtain competing purchasers who would bid up the price to his disadvantage. He was free to sit things out—but not to interfere.

Anyone who has had the patience to read the previous sections of this opinion will not require elucidation on how far Ross departed from this norm. We need not decide whether his desire to purchase on a "package" basis when he knew that his right of first refusal extended only to a part that was severable only with difficulty and having the trustee make his $800,000 package offer the starting point for the auction would alone make it impermissible for him to put forward his right of first refusal on the Pigeons stock as a roadblock when active bidding for the package appeared—although in fact we think this point has much substance. We likewise need not consider what now seems to have been the clear inadequacy of his initial offer. We concentrate rather on what happened after—apparently to his surprise and surely to his discomfiture—Edison had made a higher bid and, more particularly, after Butler had also displayed serious interest.

The Edison bid of April 14, formalized on May 3, 27% higher in face amount than Ross' and payable in cash as distinguished from Ross' package of 62½% in cash and 37½% in 6% notes, triggered Ross' letter of April 24, 1978 advancing his right of first refusal on the Pigeons stock and demanding that bidders be notified of it. Butler's display of interest on April 27, 1978 created

more serious worry. It gave rise to the prospect of a war between two well financed bidders, motivated in part by a desire of each to keep the properties out of the hands of the other. This led to Ross' meeting with Butler representatives in Los Angeles, his trip to Atlanta to continue negotiations with Butler and the execution of the JVA, which eliminated Butler as an independent bidder competing with Edison, as it had strongly indicated an intention to be. Not only were these events not disclosed to the trustee, they were affirmatively concealed from him by a course of conduct culminating in Ross' and Cook's attempt, on May 10, to obtain assistance from the court on the basis of an affidavit which made not the slightest mention of what Ross had done.

■ We agree with Ross and Butler that the case is not governed, as Edison claims it to be, by the broad statement in *Donovan & Schuenke v. Sampsell*, 226 F.2d 804 (9 Cir.), cert. denied sub nom. *Freedman v. Donovan & Schuenke*, 350 U.S. 895, 76 S.Ct. 152, 100 L.Ed. 787 (1955), that:

> Where the property is in possession of the bankruptcy court, an interested party need only prove that the purchaser was in a trust relationship with regard to the property itself, the creditors of the estate or the officers of the court, to render the sale void.

*Id.* at 811. In that case the purchaser, a former president of the bankrupt, had certain duties in connection with selling the bankrupt's property and was not the holder of a court-sanctioned preemptive right. Compare *Twin Lick Oil Co. v. Marbury*, 91 U.S. 587, 23 L.Ed. 328 (1876). We also accept Ross' and Butler's contention that, as said in *Kearney v. Taylor*, 56 U.S. (15 How.) 494, 520–21, 14 L.Ed. 787 (1854), bidding is not improperly chilled by "the mere fact of an association of persons formed for the purpose of bidding" at a sale since this may be "not only unobjectionable but oftentimes meritorious, if not necessary" to enable the persons associating themselves to participate in the bidding, rather than to shut out

competition. We likewise agree that ordinarily an agent may bid at a judicial sale on behalf of an undisclosed principal. See *Ward v. The Raleigh*, 37 F. 125 (Cir.Ct.S.D. N.Y.1888); *In re Williams*, 197 F. 1 (4 Cir. 1912).

█ None of these principles excuses what Ross and Butler did. The bidder whom the JVA sought to eliminate was Butler, which had no need of financial help from Ross. If, as is claimed, Butler had no interest in the dress operations, that could have been handled by an arrangement giving it a put and Ross a call on them at a fair proportion of the purchase price but leaving Butler in the auction. Such a course would have kept the field open in the vigorous bidding contest between Edison and Butler, partly motivated by a desire of each party not to let the other acquire the stores, that promised so much for the Beck estate—but could well have lifted the price to a figure so high that Ross' right of first refusal on the Pigeons stock, assuming that this could have been separated, would have been beyond his means. The genius of the JVA from the standpoint of Ross and Butler was to conceal that Butler was the real bidder and to use Ross' right of first refusal on the Pigeons stock, not simply in his own interest but also in Butler's, and by both these tactics to keep the price down. Genius this may have been in Ross' and Butler's eyes, but it was an evil genius, and known to be, as shown by their concealment of it from the trustee and the court, with the result that the May 11 proceedings became a game of blind-man's buff. Bankruptcy courts do not tolerate such conduct even from those who are not fiduciaries, *In re Ethier*, 118 F. 107 (E.D.Wis.1902), much less from one who is.

Ross and Butler advance essentially two arguments in answer. One is that although the trustee admittedly was not informed of the JVA until after the May 11 hearing, and learned of it then only because his accountants declined to be parties to their efforts at further concealment, he did learn on the afternoon of May 10 that in some way Butler was helping or backing Ross and would not make an independent bid. Perhaps a sufficient reply would be to ask why if this information was just as good as full disclosure of the JVA, Ross and Butler made such efforts to conceal the latter. While it is difficult in the light of hindsight to understand why the trustee did not press harder to find out what was really going on between Ross and Butler, we are not disposed to be severe on the victim of improper concealment or generous to its perpetrators. It was Ross' duty to disclose his dealings with Butler both to the trustee and to the court. Particularly in light of the silence on this subject in Ross' affidavit in support of the order to show cause, the trustee could justifiably have believed that no such arrangement existed.

The other argument is that, as events finally developed, Ross did not use his right of first refusal on the Pigeons stock to force a separation of the package, and that the failure to obtain a higher price was due solely to Edison's declining to increase its bid until its then limited legal contentions with respect to the existence of Ross' right of first refusal had been determined. The district judge provided some of the answers to this. The trustee's mid-hearing concession that Ross' right of first refusal extended to the whole package, directly opposed to everything that anyone had said before and withdrawn long before confirmation of the sale, was, as the district court found, the product of desperation engendered by Ross' devious actions. It is simply impossible to say that the price to be received by the estate is what it would have been if Ross had not entered into the JVA and concealed Butler's role. Courts do not take kindly to arguments by fiduciaries who have breached their obligations that, if they had not done this, everything would have been the same. *Cf. Branch v. White*, 99 N.J.Super. 295, 239 A.2d 665, 674, *cert. denied*, 51 N.J. 464, 242 A.2d 13 (1968) (burden of proof on defaulting trustees clearly to negate causal connection between default and loss to the beneficiary where pension fund trustees claimed potential beneficiaries would have lost pensions regardless of trustees' wrongful failure to notify them of availability of

benefits); *Estate of Stetson*, 463 Pa. 64, 345 A.2d 679, 690 (1975) (trustee has burden of proving loss would have occurred in absence of breach of duty of care. "[A]s between innocent beneficiaries and a defaulting fiduciary, the latter should bear the risk of uncertainty as to the consequences of its breach of duty").

We thus hold that the bankruptcy judge erred in confirming the sale not only for the reasons stated by the district judge, but also on the grounds just set forth. This bears importantly on the question of what course should now be followed.

## IV.

We begin by rejecting Edison's claim that we should direct that its bid of $1,368,000 be accepted. Our conclusion that bidding was chilled dictates a new auction free from the chill, not a confirmation to one of the bidders at the previous auction even though its conduct was unexceptionable. We likewise reject Edison's request to bar Ross and Butler from bidding because of their misconduct. Although we do not doubt our power to do this, see *Murdock's Case*, 2 Bland 461, 465 (Md.Chancery 1829), our objective is to maximize the bidding, not to restrict it.

While we are unwilling to go the full length sought by Edison, we do go part of the way. Although we do not bar Ross or Butler from bidding, our conclusion with respect to the JVA dictates a requirement that Ross may not bid pursuant to that agreement and that the bankruptcy judge must be satisfied that any bidding by Ross or Butler is independent.[14] We also direct

that Ross shall not be allowed, after all that has here transpired, to interpose his right of first refusal on the Pigeons stock as a bar to a sale of the package and require a separation. Ross' employment agreement, containing the right of first refusal, not only required approval of the court but remained subject to its supervision. Our statement of the facts and our previous discussion suffice to demonstrate that this is an appropriate equitable remedy for Ross' misconduct, which has subjected the Beck estate to great expense and delay.[15] We do not minimize Ross' contribution to the success of the Baker-Pigeons operation, but equally successful efforts by other fiduciaries have not protected them from drastic remedies when their conduct has violated legal requirements. See *Wolf v. Weinstein*, 372 U.S. 633, 637, 653–57, 83 S.Ct. 969, 10 L.Ed.2d 33 (1963). Any legitimate interest of his can be protected by the bankruptcy judge's giving him a reasonable opportunity to meet any bid for the package, with the bidder then having an opportunity to make a still higher bid.[16] Matters should now proceed promptly; more than a year has elapsed since the purported auction sale.

The judgment of the district court is therefore affirmed insofar as it ordered the bankruptcy judge to vacate his confirmation of the sale to Ross and is modified as herein stated insofar as it denied any further relief. The cause is remanded for expeditious further proceedings in the district court and then in the bankruptcy court consistent with this opinion, and the mandate shall issue forthwith. The trustee may recover his costs; Edison may recover two-thirds of its costs.

14. This does not mean that Ross may not associate with others wishing to participate as investors; what he may not do is to remove from the auction someone who constitutes a potential bidder in his own right. Likewise we would not bar an association between Ross and some other bidder (including Butler) that would allow Ross to acquire the dress business if the bidder succeeded.

15. The remedy is analogous to the principle that a court may deny compensation to a trustee who has committed a breach of trust, 3 Scott, The Law of Trusts § 243 at 2138–39

(1967); I Restatement of Trusts (Second) § 243 (1959); *Berner v. Equitable Office Bldg. Corp.*, 175 F.2d 218, 222 (2 Cir. 1949); *In re Johnson*, 518 F.2d 246, 256 (10 Cir.), *cert. denied sub nom. Clark v. Johnson*, 423 U.S. 893, 96 S.Ct. 191, 46 L.Ed.2d 125 (1975).

16. See also note 14. Moreover, if Ross desires, we would see no objection to the bankruptcy judge's requiring that a purchaser of the package should buy Ross' 15% interest in Pigeons at a figure considered to be appropriately related to the bid, as was provided in Edison's offer.